IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**FILED**
SCRANTON

APR 1 0 2008

PER ~~m. L. k~~
DEPUTY CLERK

IN RE CARGILL MEAT SOLUTIONS
WAGE AND HOUR LITIGATION

: No. 3:CV-06-~~513~~
:
: (JUDGE NEALON)
:

**MEMORANDUM and ORDER**

This action is the consolidation of Civil Action Nos. 3:06-cv-00513, 3:06-cv-00532, and 3:06-cv-01420. (3:06-cv-00532, Doc. 34). The three actions alleged that the Defendant, Cargill Meat Solutions Corporation, (hereinafter "Cargill") failed, and continues to fail, to compensate workers for time spent donning, doffing, waiting for, gathering, maintaining, and sanitizing work-related clothing, gear, and equipment and for time spent traveling between the changing area and the production line before and after shifts and during break times. (3:06-cv-00513, Doc. 1, ¶ 3); (3:06-cv-00532, Doc. 5, ¶¶ 10-14); (3:06-cv-01420, Doc. 1, ¶ 3). On August 8, 2006, the three actions were consolidated into one action under Civil No. 3:06-cv-00513. (Doc.[1] 34). Presently before the Court is the Motion for Summary Judgment (Doc. 265) of Cargill.

---

[1] "Doc." will refer to a document from 3:06-cv-00513, unless otherwise specified.

## I.   PROCEDURAL HISTORY

On March 10, 2006, Plaintiff Larry Curtis and several other employees of Cargill's Wyalusing meat processing facility (hereinafter "Wyalusing Plaintiffs") filed a class action complaint (3:06-cv-00513) against Cargill asserting that Cargill failed to properly compensate the Wyalusing Plaintiffs.  (Doc. 1).  The Complaint alleges: Count I, violation of the Pennsylvania Minimum Wage Act ("PMWA"); Count II, breach of contract; Count III, violation of the Pennsylvania Wage Payment and Collection Law ("PWPCL"); Count IV, restitution; and Count V, unjust enrichment.  Id.  As a result of Defendant's Motion to Dismiss (Doc. 7) filed on April 10, 2006, Counts II and V of the Complaint were limited to the period after March 10, 2002, Count III was limited to the period of time after March 10, 2003, and Count IV was dismissed.  (Doc. 11).

On March 13, 2006, Farida Rahman and several former and current employees of Cargill's Hazleton meat processing facility initiated a class action lawsuit (3:06-cv-00532) alleging that Cargill failed to adequately compensate its employees at its Hazleton plant.  (3:06-cv-00532, Doc. 5).  The Amended Complaint asserts: Count I, violation of the Fair Labor Standards Act ("FLSA"); Count II, violation of the PMWA; and Count III, violation of the PWPCL.  Id.

On July 20, 2006, the Wyalusing Plaintiffs filed a class action lawsuit (3:06-

cv-01420) against Cargill alleging violations of the FLSA.  (3:06-cv-01420, Doc. 1).

A Joint Motion to Approve Settlement Agreement (Doc. 255) was filed on July 12, 2007, and on July 26, 2007, the Settlement Agreement was approved and all legal claims against Cargill regarding its Wyalusing plant were dismissed. (Doc. 258).  Consequently, only the Hazleton Plaintiffs' FLSA, PMWA, and PWPCL claims remain.

On September 5, 2007, Cargill filed a Motion for Summary Judgment (Doc. 265) and a Brief in Support (Doc. 266).  The Hazleton Plaintiffs (hereinafter "Plaintiffs") filed a Brief in Opposition (Doc. 274) on November 9, 2007, to which Cargill filed a Reply (Doc. 284) on December 21, 2007.  On January 8, 2008, Plaintiffs filed a Notice of Supplemental Authority (Doc. 285) and on January 17, 2008, Cargill filed a Response thereto (Doc. 286).  In addition, Cargill filed a Statement of Undisputed Facts (Doc. 267) to which Plaintiffs filed a Response (Doc. 273).  Thereafter, Cargill filed a Reply (Doc. 283) to the additional facts contained in Plaintiffs' Response. The Motion for Summary Judgment is now ripe for disposition and, for the following reasons, the Motion will be granted in part and denied in part.

3

## II.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340-41 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Once such a showing has been made, the nonmoving party cannot rely upon conclusory allegations in its pleadings or briefs to establish a genuine issue of material fact. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695(1990); FED. R. CIV. P. 56(e).  Rather, the nonmoving party must go beyond the pleadings and offer specific facts contradicting those averred by the movant which indicate that there is a genuine issue for trial. Id.

To determine whether the nonmoving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the non-movant. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. Id. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."" Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1592 (1968). All inferences, however, "should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore v. Bel Tel. Co., 24 F.3d 508, 512 quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## III.   FACTUAL SUMMARY[2] [3]

Cargill owns and operates a case-ready beef and pork processing, packaging and shipping plant in Hazleton, Pennsylvania, from which it distributes meat products throughout the United States.  The Hazleton Plant has about eight-hundred employees of whom approximately six-hundred ninety are hourly personnel and members of a bargaining unit represented by the United Food and Commercial Workers Local 1776 (hereinafter "Union").

The hourly employees wear a variety of protective gear and safety equipment in the performance of their duties.  All workers are required to wear a smock, hard hat, hair net, earplugs, steel-toed boots, gloves, and safety glasses while some also wear additional personal protective equipment.  The personal protective equipment worn varies by department and depends on the work performed by each employee and the employee's preference.  Certain "mesh-wearing" employees, approximately ten percent of the Union employees, work in the job class of "knife worker" or "wizard knife operator" and wear, *inter alia,*

---

[2]This section contains the material facts alleged in Cargill's Local Rule 56.1 statement (Doc. 267) which are admitted in Plaintiffs' Answer thereto (Doc. 273).

[3]Cargill's argument that paragraphs 12-15, 21-23, 28, 30-31, 42, and 48-52 of its Statement of Undisputed Material Facts should be admitted under Local Rule 56.1 due to Plaintiffs' general denial is not addressed because a ruling on those factual assertions is unnecessary for the disposition of Cargill's motion.  (Doc. 284, pp. 4-9).

cut-resistant gloves, cut-resistant sleeves, mesh gloves, mesh sleeves, and a mesh apron. Plaintiffs contend that this mesh safety equipment is not only donned by the "mesh-wearing" employees but by other employees as well. (Doc. 273, p. 9, ¶ 6).

Since the Hazleton Plant began operation in January 2002, Cargill has paid "mesh-wearing" employees an extra five minutes worth of compensation per day for the time it allegedly takes to don and doff their personal protective equipment and for related activities. These related activities include time spent waiting to pick up or drop off personal protective equipment and time spent walking to a work station before employees are "on the clock," or to locker rooms after employees have "punched out."

The Plaintiffs have been covered by a collective bargaining agreement (hereinafter "CBA") between Cargill and the Union from May 10, 2002 until the present day. The 2002 CBA governed from May 10, 2002 through February 25, 2007 and the 2007 CBA from February 26, 2007 to the present. These contracts cover(ed) all production and maintenance employees. Throughout the negotiations preceding the 2002 CBA and during the term of the 2002 CBA, Cargill continued paying five minutes worth of compensation daily to "mesh-wearing" employees for donning, doffing, and related activities. Neither the

Union nor Cargill management raised the five minutes of pay for the "mesh-wearing" employees or the failure to pay "non-mesh-wearing" employees for said activities during the negotiations for the 2002 CBA which is silent on compensation for time spent donning and doffing.  No grievances were filed under the 2002 CBA by the Union or any employee concerning Cargill's additional payment to "mesh-wearing employees" for donning and doffing or the failure to similarly compensate "non-mesh-wearing" employees.

During the negotiations for the 2007 CBA, Cargill continued to pay five minutes worth of compensation to "mesh-wearing" production employees.  On September 21, 2006, the Union made a written proposal to Cargill which stated:

> U-26 New Section 1 - The Company will compensate employees for any donning, doffing, walking, waiting or washing time in accordance with applicable federal and state laws.

The Union made this proposal at the request of the International Union, which wanted to insert a uniform statement regarding donning and doffing practices in its collective bargaining agreements across the country.  The Union's U-26 proposal was not accepted by Cargill and the Union ultimately decided not to pursue it. The 2007 CBA is also silent on the issue of compensation for donning and doffing but Cargill has continued to pay "mesh-wearing" employees an additional five minutes for donning and doffing.  Since the 2007 CBA has been in effect, no

grievances have been filed regarding Cargill's payment, or lack thereof, for

donning and doffing.

## IV.   PERSONAL PROTECTIVE EQUIPMENT

Cargill's Safety Rules refer to the items worn by employees to control work

place hazards as Personal Protective Equipment (PPE).  (Doc. 275-2, p. 12).

These Safety Rules note that the PPE has little or no fashion value and "[w]hat is

important is not how it looks on you, but how much protection you have by

wearing it."  Id. According to the Safety Rules, at the inception of employment,

employees are issued a locker, lock, and PPE.  (Doc. 275-4, p. 19).  However, the

deposition testimony of record establishes that not all Hazleton plant employees

are issued lockers.  See (Doc. 283-2, Ex. 1, Ex. p. 129); see also (275-7, Ex. 6, Ex.

pp. 99 and 103).  Cargill is not responsible for any stolen or lost personal property

and any loss of PPE is the responsibility of the employee who will be required to

pay for equipment being replaced.  Id.

Per the Safety Rules, certain PPE is required to be worn by Cargill

employees: hard hats, eye and face protection, and hearing protection.  (Doc. 275-

2, pp. 12-13).  "Violation of a safety rule will result in disciplinary action, possibly

including discharge from employment."  (Doc. 275-3, p. 4).  "All employees will,

9

without exception, properly wear required safety equipment for the specific job being performed." Id. at 5. Defective equipment must be reported immediately to an employees' supervisor and defective safety equipment will be replaced at no charge. Id. Cargill requires employees to check their PPE "before use to ensure that there are no holes, frayed straps, cracks, breaks or any other condition(s) that could render the equipment ineffective." Id. Employees are to "[e]nsure that all PPE is properly fitted and in good repair." Id. at 17.

Hard hats are designed to protect employees' heads from falling objects and electrical shock and must be worn in all production, distribution and maintenance areas of the plant and also when performing tasks outside the building or anywhere on the property. (Doc. 278-2, p. 12.)

The correct eye and face protection must also be worn when working with liquid chemicals (acids or caustics), flying particles (bone, fat, meat or metal), and hazardous gases (cryogenic, ammonia or chlorine). Id. Extra-specialized eye protection is mandatory for work that involves activities like welding, chipping, grinding, or handling chemicals. Id. More specifically, under the subsection Eye Protection, the code book notes that employees operating meat cutting saws are required to wear safety glasses with wide shields and that, as noted in the proper task procedures, other jobs will require safety glasses. Id. at 6. "Extra-

10

specialized eye protection is mandatory for specialized work. This includes such things as goggles for welding, face shield or goggles for chipping and grinding, face shield for the handling of hazardous chemicals, welders' goggles for torch work, etc." Id.

There are hazards associated with the noise level in the building which can cause loss of hearing over time. Id. at 13. Employees are required to wear earplugs anytime they are inside the facility's production, distribution, and maintenance areas and to wash their earplugs at least once a week with warm water and soap. Id. Employees are also given an audiogram during the initial post-offer physical and annually thereafter. Id.

Employees are required to wear steel-toed boots with an oil resistant sole anytime they enter the production, distribution, and maintenance areas and also when performing work outside the building, or anywhere on Cargill's property. Id. Boots are required to reduce the risk of injuries which "are most likely to occur when heavy or sharp objects fall on your feet, something rolls over your foot, or you step on an object that pierces the sole of your boot." Id. Further, foot protection is periodically checked by members of the excel team and defective or unsafe boots will be required to be changed immediately. Id.

In addition to the above, there are certain "Meat Cutting PPE" which are

task specific. Id. at 13-14. In other words, Cargill requires, as specified in the

task procedure of the Safety Rules, that certain of the following PPE be worn for

specific tasks: mesh belly guard, mesh sleeve, mesh glove, wizard sleeve, wizard

glove, and knife scabbard (pouch). Id. The mesh belly guard is a two-shoulder

strap apron with a waist strap, which is required to be worn above the collar bone

for torso protection. Id. at 14. The mesh sleeve is required to be worn high on an

employee's arm, up to the shoulder, to protect the non-knife arm. Id. The mesh

glove is necessary for non-knife hand protection and the Safety Rules suggest that

it be worn over a white cotton glove. Id. The wizard sleeve is made of a polyester

type material with steel woven into the fabric and is to be worn on the employee's

knife arm to protect from being cut by a coworker standing to the side. Id. The

wizard glove is made of the same material as the wizard sleeve and is designed to

protect the knife hand. Id. The wizard gloves "are used as well when changing

blades in equipment, or using small cutting instruments (i.e. box cutters)." Id.

The wizard sleeve and glove must overlap just at the mesh to provide maximum

protection for the wrist area. Id. The knife scabbard (pouch) is a 12-inch plastic

scabbard holding up to three knives and a meat hook. Id. The scabbard provides

protection from pokes and cuts by guarding the blades of knives. Id.

 For employees handling hazardous materials, "[p]rotective equipment <u>must</u>

be worn that is recommended on Material Safety Data sheets." Id. at 7. (emphasis added). "This includes, although it is not limited to, eye protection, rubber gloves, and protective clothing." Id.

The subsection Personal Protective Safety Equipment of the Specific Safety Rules lists the following examples of PPE: (a) helmet, (b) five finger mesh glove with cuff, (c) mesh apron and/or leggings, (d) plastic or mesh arm protection, (e) whizzard knife material glove or arm protection, (f) goggles, safety glasses, (g) ear protection, (h) respirators, (i) welding screens, and (j) weight belt or comp vest. Id. at 10.

Cargill's Specific Safety Rules for Personal Hygiene/Food Safety requires that a hair net must cover all hair. Id. A Personal Hygiene Practices Handout distributed to employees in July 2003 stated that hairnets, gloves and frocks are required. (Doc. 275-5, p. 1). Clean frocks prevent transfer of bacteria from clothes to food. Id. Under the subsection Respiratory Protection, the code book states that voluntary use of dust masks is allowed in areas where engineering controls are in place and the concentration of contaminants is below the permissible limits. (Doc. 275-3, p. 4).

Under the subsection Safety Harness, Cargill requires that fall arresting harnesses be worn whenever it is necessary to work on the top of cars, trucks, or

other equipment at points other than the designated platforms or walkways. Id.
These fall arresting harnesses prevent falling from work surfaces four feet above
an adjacent surface. Id.

The Specific Safety Rules, under the subsection "Clothing," require all
employees to wear shirts with short or long sleeves and pants. (Doc. 275-3, p. 6).
Sandals and shoes with soft soles, rings and jewelry, and torn, ragged or loosely
hanging clothing are not permitted. Id. PPE is not discussed under the "Clothing"
subsection of the Specific Safety Rules. Id.

There is nothing in the record indicating with specificity the protective gear
worn in each department. The record does contain a chart of the Hazleton plant
job titles, the department in which the job is contained, and the number of
employees in that job title. (Doc. 275-8, pp. 8-11). However, this chart does not
list the PPE donned and doffed by each specific job title or by department. Id.
Cargill alleges that nine percent of the Hazleton employees work in positions
requiring a knife and the wearing of cut-resistant gear or protective mesh
equipment. (Doc. 275-8, p. 2, ¶ 7). Cargill further alleges that employees in forty-
nine of the ninety-one job classifications wear "only a Hardhat, Eye Protection,
Steel-toed boots, Hearing Protection" and employees working in thirty-seven of
the job classes "wear a Hardhat, Eye Protection, Steel-toed boots, Hearing

14

Protection and Cut Resistant Gloves.  (Doc. 275-8, p. 2, ¶ 8).  "Employees working in five of the job classes at Hazleton (approximately seventy employees) wear the basic PPE and also wear Cut Resistant Sleeve, Mesh Glove, Mesh Sleeve, Mesh Apron."  Id.

Plaintiffs assert that "non-mesh-wearing" employees don and doff equipment in addition to the following required equipment: smock, hard hat, hair net, ear plugs, steel-toed boots, and safety glasses.  See (Doc. 275-8, Ex. 7, pp. 2-3, ¶ 8).  This is evidenced by the above statement that employees working in thirty seven of the job classes also wear cut resistant gloves.  (Doc. 275-8, p. 2, ¶ 8).  The Plaintiffs highlight that "cotton gloves must be worn by any employee handling exposed product" in the Beef and Pork Department and must be "changed at each break."  (Doc. 273, p. 5, ¶ 5(m)) citing (Doc. 275-8, Ex. 7, p. 3, ¶ 11).  The Plaintiffs also point out the numerous job classifications that require, inter alia, plastic gloves (seven separate job classifications), rubber gloves (seventeen separate job classifications), plastic sleeves (eight separate job classifications), and cut resistant gloves (thirty-seven job classifications).  See (Doc. 273, p. 7-9); see also (Doc. 275, Part 10-12).

There is no evidence concerning the actual time necessary to don and doff the separate items of equipment.  Additionally, it is difficult to envision and

15

comprehend the size, weight, and description of some of the equipment from the

present record.

## V.   ISSUES

A) Whether section 203(o) of the FLSA bars Plaintiffs' claim for protective
equipment donning and doffing time;
        i) Whether Plaintiffs claims for walking, waiting and
        equipment cleaning time are viable;

B) Whether section 259 of the FLSA provides Cargill with a complete
defense to Plaintiffs' donning, doffing and related claims;

C) Whether the FLSA and LMRA section 301 preempt Plaintiffs' state law
claims; and

D) Whether Plaintiffs' state law claims lack substantive merit.

## VI.   DISCUSSION

The Plaintiffs, employees of Cargill's Hazleton plant, seek back pay for

time spent donning, doffing, waiting for, gathering, maintaining, and sanitizing

work-related clothing, gear, and equipment and for time spent traveling between

the changing area and the production line before and after shifts and during break

times.  (Doc. 1, ¶ 3).

In 1938, Congress enacted the FLSA, 29 U.S.C. §§ 201-219, to correct

existing "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987). The FLSA, designed to benefit employees, created, *inter alia*, a minimum wage (§ 206), maximum hours to be worked per week and overtime rates for time worked above the maximum hours (§ 207), and child labor protections (§ 212). Between July 1, 1946 and January 31, 1947, employees around the country filed 1,913 actions under the FLSA for violations of the eight-hour work day. De Asencio v. Tyson Foods, Inc., 342 F.3d. 301, 306 (3d Cir. 2003), citing 93 Cong. Rec. 2,082 (1947). In 1947, Congress passed the Portal to Portal Act, 29 U.S.C. §§ 251-262, to protect employers from litigation stemming from the FLSA being "interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers." 29 U.S.C. § 251. The Portal to Portal Act relieved employers from responsibility for compensating an employee for activities which were preliminary or postliminary to the employee's principal activity or activities

17

or "which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a).

The United States Supreme Court, in interpreting the Portal to Portal Act and the FLSA, defined the compensable "workday" generally as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." IBP, Inc. v. Alvarez, 546 U.S. 21, 29, 126 S. Ct. 514, 163 L. Ed. 2d 288 (2005) citing 29 CFR § 790.6(b). The term "principal activity or activities" in the Portal to Portal Act embraces all functions which are an integral and indispensable part of the principal activities. Steiner v. Mitchell, 350 U.S. 247, 252-53, 76 S.Ct 330, 100 L. Ed. 267 (1956)(holding that showering and changing clothes and the time incident to such activities is compensable in a battery plant where such activities are vital considerations of health and hygiene and required of the employer by state law). "Activities such as donning and doffing of specialized protective gear 'that are performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed.'" Alvarez, 546 U.S. at 30 citing

18

Steiner, 350 U.S. at 256; see also De Asencio, 500 F.3d 361(The Court adopted

the reasoning of the Ninth Circuit Court of Appeals in Alvarez, that donning and

doffing of "protective gear" was compensable work time under the FLSA and a

principal activity under the Portal to Portal Act.  The De Asencio Court further

concluded that "the exertion of the change activities was not at issue in deciding

whether they were "work" as used in the FLSA.), citing Ballaris v. Wacker

Siltronic Corp., 370 F.3d 901 (9th Cir. 2004).  The donning and doffing of

equipment at the beginning and end of the day are "principal activities" and under

the "continuous workday" rule any activities between the commencement and

completion of the donning and doffing is compensable.  Alvarez, 546 U.S. at 30.

Thus, pursuant to the reasoning in Alvarez and De Asencio, it is concluded

that the time Plaintiffs spent donning, doffing, gathering, maintaining, and

sanitizing work-related gear and equipment and the time spent traveling between

the changing area and the production line, before and after shifts and during break

times, is compensable under the FLSA and the Portal to Portal Act.

## A.    FLSA § 203(o) Defense

In 1949, Congress amended the FLSA and added § 203(o) which provides:

(o) Hours Worked. In determining for the purposes of sections 6 and
7 [29 USCS §§ 206 and 207] the hours for which an employee is
employed, there shall be excluded any time spent in changing clothes
or washing at the beginning or end of each workday which was

> excluded from measured working time during the week involved by
> the express terms of or by custom or practice under a bona fide
> collective-bargaining agreement applicable to the particular
> employee.

29 U.S.C. § 203(o). § 203(o) was added to "strengthen the employer-protective

Portal-to-Portal Act by closing a 'loophole' therein" and to "avoid another series

of incidents which led to the portal-to-portal legislation." Anderson v. Cagle's

Inc., 488 F.3d 945, 958 (11th Cir. 2007) citing 95 Cong. Rec. 11,433 (daily ed.

Aug. 10, 1949)(comments of Representative Herter).

As discussed below, there is considerable disagreement among federal

courts concerning the interpretation of FLSA § 203(o). Cargill takes the position

that § 203(o) bars time spent donning and doffing any and all protective clothing

and equipment worn by its employees from being compensable. To succeed on its

§ 203(o) defense, Cargill must establish: (1) the protective equipment worn by the

Plaintiffs is "clothes" under § 203(o); and (2) the payment/non-payment of the

Hazleton Plaintiffs for donning and doffing the protective equipment qualifies as a

"custom or practice" under the 2002 CBA and the 2007 CBA. Id. Further,

because this is a motion for summary judgment, Cargill must establish that there is

no genuine issue of material fact regarding the above two elements. See Turner v.

City of Philadelphia, 262 F.3d 222, 225 (3d Cir. 2001). All factual disputes must

be resolved in favor of the non-movant. Id.

20

i. Clothing

To support its argument that the protective equipment worn by the Hazleton

Plaintiffs is clothing under § 203(o), Cargill references four Circuit Court cases. It

relies primarily on Anderson v. Cagle's, Inc., 488 F.3d 945 (11th Cir. 2007) in

which the Eleventh Circuit Court of Appeals held, *inter alia*, that § 203(o) applies

to "various articles of protective clothing, including smocks, hair/beard nets,

gloves, and hearing protection" worn by employees in a chicken processing plant.

Anderson, 488 F.3d at 949, 955. However, the Court recognized "that there may

be limits to the application of § 203(o) based on the nature or purpose of the

garments at issue." Id. Cargill also cites De Asencio v. Tyson Foods, Inc., 342

F.3d 301 (3d Cir. 2003) contending that therein the Third Circuit Court of Appeals

characterized safety equipment worn by chicken processing employees, consisting

of hairnets, earplugs, safety goggles, cotton smocks, gloves and plastic aprons, as

"protective clothing." De Asencio, 342 F.3d. at 304. However, De Asencio did

not address the question of whether the donning and doffing of such safety

equipment was excluded from compensable time under § 203(o). Id. In Gorman

v. Consolidated Edison Corp., 488 F.3d 586 (2d Cir. 2007), the Second Circuit

Court of Appeals also did not address § 203(o) but rather determined that the

donning and doffing of helmets, safety glasses, and steeled toed boots were

preliminary and postliminary activities under Alvarez, 546 U.S. 21 and, therefore,

not compensable. Gorman, 488 F.3d at 594. Cargill refers further to the Fifth

Circuit Court of Appeals' holding in Bejil v. Ethicon, Inc., 269 F.3d 477 (5th Cir.

2001), that lab coats, shoe coverings and hair or beard coverings are "outer

garments" and fall withing Webster's definition of "clothing" as "covering for the

human body or garments in general," and are therefore "clothes" under § 203(o).

Bejil, 269 F.3d at 480, n.3.

In addition, Cargill relies on seven district court cases to support its

position. In Saunders v. John Morrell & Co., 1991 U.S. Dist. LEXIS 21069, 1991

WL 529542 (N.D. Iowa 1991), the District Court for the Northern District of Iowa

held that putting on and taking off safety equipment by meatpacking workers,

including steel-mesh gloves, synthetic-mesh gloves, goggles, helmets, arm guards,

belly guards, knife and cut resistant gloves, knife guards, steel-toed shoes, rubber

boots, rubber gloves, rubber aprons, and steel-mesh aprons, was an activity subject

to bargaining that could be excluded under § 203(o). Saunders, 1991 U.S. Dist.

LEXIS 21069, at *3. The Saunders court further found that § 203(o) did not cover

the washing/cleaning of safety equipment and that washing of the equipment was

compensable pending a hearing regarding application of the *de minimis* doctrine.

Saunders, 1991 U.S. Dist. LEXIS 21069, at *14, 22. In Fox v. Tyson Foods, Inc.,

the District Court for the Northern District of Alabama reversed its denial of

summary judgment following the Eleventh Circuit Court of Appeals' decision in

Anderson, 488 F.3d 945. See Fox v. Tyson Foods, Inc., Case Nos. 4:99-cv-1612;

4:06-cv-4676; 4:06-cv-4677 (N.D. Ala. filed Aug. 31, 2007).  Based on the

intervening controlling precedent, the Northern District Court of Alabama

determined that § 203(o) applied to the pre-shift and post-shift clothes changing

activities. Id.  As additional authority, Cargill cites Anderson v. Pilgrim's Pride

Corp., 147 F. Supp. 2d 556 (E.D. Tex. 2001), aff'd 44 Fed. Appx. 652 (5th Cir.

2002) for the holding that the putting on and removal of safety equipment at a

chicken processing plant was excluded from compensable time under § 203(o).

Anderson, 147 F. Supp. 2d  at 552.  The District Court for the Eastern District of

Texas noted that poultry workers, like meat packing workers, wear earplugs,

hairnets, cotton frocks, rubber aprons, rubber gloves, and cotton gloves; however,

meat packing employees also wear heavier, more cumbersome clothing such as

scabbards, arm guards, arm mesh, mesh aprons, back mesh, a "wizard glove", and

gaiters. Id.  The Court excluded the donning and doffing of this equipment under

§ 203(o) because the employees were under a collective bargaining agreement and

the long-standing policy of non-compensation for these activities constituted a

"custom" for purposes of § 203(o) and because the time spent donning and doffing

23

was *de minimis* as a matter of law. Id. at 564-65. In Kassau v. Kerry, Inc., 487 F.

Supp. 2d 1063 (D.Minn. 2007), the District Court for Minnesota held that

uniforms consisting of a shirt, pants, and a smock were "clothes" and thus

excluded under § 203(o), but that hair nets, beard nets and safety glasses were

perhaps different, as they were purely functional and not generally considered

"clothes." Kassau, 487 F. Supp. 2d at 1066-67, n.1. Nevertheless, the Kassau

Court ultimately concluded that the donning and doffing of the hair and beard nets

and safety glasses was *de minimis* and not compensable. Id. However, the Kassau

Court distinguished its factual scenario from Fox v. Tyson Foods, Inc., 2001 U.S.

Dist. LEXIS 26050 (N.D. Ala. 2001)[4], noting that Fox involved not only items like

those involved in its case but also, among other things, "protective mesh gloves . .

. dust masks, plastic sleeve covers, and hard plastic arm guards." Id. at 1067. In

Davis v. Charoen Pokphand (USA), Inc., 302 F. Supp. 2d 1314 (M.D. Ala. 2004),

the District Court for the Middle District of Alabama determined that a hairnet,

earplugs, smock, rubber gloves, cutting gloves, apron, arm guards, jumpsuit,

boots, hardhat and plastic sleeves were "clothes" under § 203(o). Davis, 302 F.

Supp. 2d at 1317-21. The District Court for the Eastern District of Texas held that

---

[4]As stated previously in this paragraph, this 2001 summary judgment decision was later reversed in an unpublished opinion based on an intervening precedent from the Eleventh Circuit Court of Appeals. The Kassau Court's decision was handed down on May 8, 2007, before the unpublished opinion reversing this Fox opinion.

time spent changing into uniforms or putting on safety glasses, earplugs, or

bumphats is preliminary and postliminary and, thus, the employees were not

entitled to compensation for that time under the FLSA. Reich v. Oscar Mayer

Foods Corp., 1995 U.S. Dist. LEXIS 22225, at *5 (E.D.Tex. 1995). In Nardone v.

General Motors, Inc., 207 F. Supp. 336 (D.N.J. 1962), the District Court for New

Jersey considered pre-shift activities by a metal finisher at an automobile body

shop, including changing clothes; obtaining tools from a tool box located right

next to the assembly line; obtaining new tools from the foreman; putting on

coveralls, gloves, aprons, goggles and hoods (hoods were only worn by certain

workers); and post-shift activities including putting away tools; taking off

coveralls and other clothing; washing up; and taking a shower at home. Nardone,

207 F. Supp. at 338. The Nardone Court held that the "policy" for payment and

non-payment did exist under the collective bargaining agreement and that the

plaintiffs failed to establish the compensable nature of the changing of clothes and

failed to establish more than *de minimis* time spent in any other activity. Id. at 340-

41.

Cargill also references two opinion letters in support of its argument. In

November 2001, Gary Bright, Cargill's Vice President of Labor Relations,

requested an opinion letter from the United States Department of Labor

25

(hereinafter "DOL") concerning how § 203(o) of the FLSA applied to donning and doffing of protective equipment, including mesh equipment, by employees in the meat packing industry.   In a letter dated June 6, 2002, Tammy D. McCutchen, Administrator at that time for the Employment Standards Administration Wage and Hour Division of the DOL, concluded that "the term 'clothes' in section 3(o) includes the protective safety equipment typically worn by meat packing employees" including "mesh aprons, plastic belly guards, mesh sleeves or plastic arm guards, wrist wraps, mesh gloves, rubber gloves, polar sleeves, rubber boots, shin guards and weight belts." (Doc. 265-12, pp. 9-11).  More recently, in a May 14, 2007 letter, Paul DeCamp, Administrator for the Employment Standards Administration Wage and Hour Division of the DOL, reaffirmed the views contained in the June 6, 2002 opinion letter that "clothes" includes "among other items, heavy protective safety equipment worn in the meat packing industry such as mesh aprons, sleeves and gloves, plastic belly guards, arm guards, and shin guards" despite the recent opinion of the Court of Appeals for the Ninth Circuit, Alvarez v. IBP, Inc., 339 F. 3d 894 (9th Cir. 2003).  (Doc. 265-12, p. 13).  This May 14, 2007 opinion letter noted that the requestor may also rely on the June 6, 2002 letter for practices outside the jurisdiction of the Ninth Circuit.  (Doc. 265-12, p. 14).

26

In response to the above referenced opinion letters, the Plaintiffs highlight three prior opinion letters. See (Doc. 276-1, pp. 1-7). These letters from the Employment Standards Administration Wage and Hour Division of the DOL stated that putting on, taking off and cleaning of the protective equipment and gear utilized in the meat packing industry was compensable and that such items were not "clothes" under § 203(o). Id. On December 3, 1997, the Administrator of the Wage and Hour Division addressed the interpretation of § 203(o) for the first time. Id. The Administrator noted that § 203(o) is an exemption from the FLSA that must be read narrowly and concluded that "[t]he plain meaning of 'clothes' in section 3(o) does not encompass protective safety equipment; common usage dictates that 'clothes' refer to apparel, not to protective safety equipment which is generally worn over such apparel and may be cumbersome in nature." Id. at 1-2. In a follow-up letter on February 18, 1998, the Administrator responded to inquiries that the December 3, 1997 opinion was inconsistent with the Field Operations Handbook. Id. at 4. The Administrator, in the February 18, 1998 letter, wrote that the Wage and Hour Division "had never formally addressed the proper construction of the terms 'changing clothes' and 'washing' in section [203(o)]" and that the Field Operations Handbook was not inconsistent with the 1997 letter. Id. In a January 15, 2001 opinion letter, the Administrator reiterated

27

and clarified the prior two opinion letters and further instructed that an employees' wages cannot be based on the average amount of time that all employees work, but that "a company must record and pay for each employee's actual hours of work, including compensable time spent putting on, taking off and cleaning his or her protective equipment, clothing or gear." Id. at 7.

The Plaintiffs argue that because the June 6, 2002 and May 14, 2007 opinion letters conflict with the DOL's earlier interpretations discussed above, they should be given considerably less deference. See Alvarez, 339 F.3d at 905 n.9.

Replying to Cargill's case citations, and in support of their position that the safety equipment is not clothing under § 203(o), Plaintiffs refer to the interpretation of § 203(o) as expressed in Alvarez. See id. The Ninth Circuit Court of Appeals determined that the donning and doffing of unique protective gear by meat packing workers constituted compensable work activities under the FLSA and the Portal to Portal Act except for the *de miminis* time associated with the donning and doffing of non-unique protective gear such as hardhats and safety goggles. Alvarez, 339 F.3d at 904. The Court first interpreted § 203(o) to be an exception to the FLSA that was to be narrowly construed against the employers trying to assert it and it should not be applied "except [in contexts] *plainly and*

28

*unmistakably* within the [given exceptions'] word and spirit." Id. at 905, citing

Klem v. County of Santa Clara, 208 F.3d 1085, 1089 (9th Cir. 2000).  The Court

determined that the protective gear at issue (hardhat; hair net; ear plugs; face

shield or safety goggles; cotton gloves; plastic gloves; rubber gloves; liquid-

repelling sleeves, aprons and leggings; safety boots/shoes; lifting belts;

mesh/metal aprons, leggings, vests, sleeves and gloves; plexiglass arm guards;

Kevlar gloves; and puncture-resistant protective sleeves) "does not 'plainly and

unmistakably' fit within § 3(o)'s 'clothing' term." Id. at 898, 905.  The Court

reasoned that "[p]ersonalized protective equipment is specialized clothing or

equipment worn by an employee for protection against a hazard.  General work

clothes (e.g. uniforms, pants, shirts, and blouses) not intended to function as

protection against a hazard are not considered to be personal protective

equipment." Id. at 905, citing 29 C.F.R. § 1910.1030(b) (1999).

Concerning the June 6, 2002 DOL opinion letter, the Alvarez Court stated:

> This position [contained in the June 6, 2002 opinion letter] directly
> conflicts with a 1997 opinion letter from the same Division, in which
> the administrator concluded that the "plain meaning of 'clothes' in
> section [203(o)] does not encompass protective safety equipment." A
> January 15, 2001, letter reaffirmed the 1997 letter's conclusion. As
> the Supreme Court has directed, "an agency interpretation of a
> relevant provision which conflicts with the agency's earlier
> interpretation is entitled to considerably less deference than a
> consistently held agency view," INS v. Cardoza-Fonseca, 480 U.S.

421, 466 n.30, 94 L. Ed. 2d 434, 107 S. Ct. 1207 (1987), and we
reject the Secretary's new, inconsistent interpretation here.

Alvarez, 339 F.3d at 905, n.9.

In 2005, the Supreme Court heard the appeal of Alvarez and noted that the

production workers in IBP's beef and pork processing plant were required to wear

outer garments, hardhats, hairnets, earplugs, gloves, sleeves, aprons, leggings and

boots and that many, particularly those who use knives, also wear a variety of

protective equipment for their hands, arms, torsos, and legs which includes chain

link metal aprons, vests, plexiglass armguards, and special gloves. Alvarez, 546

U.S. at 29. The Supreme Court determined that the donning and doffing of this

protective gear was a principal activity of the workday for which the employees

were entitled to compensation. Id. The Supreme Court concluded "that the

locker rooms where the special safety gear is donned and doffed are the relevant

'place of performance' of the principal activity that the employee was employed

to perform." Id. at 34. (Emphasis added). The Court did not directly address the

issue of whether the above referenced equipment was "clothing" under § 203(o);

nevertheless, throughout the opinion, the Court referred to the equipment as

"protective gear." Id. Further, the Court agreed with the holding of the Ninth

Circuit Court of Appeals, to the extent that the donning and doffing of "unique

protective gear" was compensable and that the donning and doffing of

30

"nonunique protective gear" was *de minimis* as a matter of law and not compensable. Id. at 32.

The Plaintiffs identify multiple district court cases which similarly support their interpretation of § 203(o). See Gonzalez v. Farmington Foods, 296 F. Supp. 2d 912, 931 (N.D. Ill. 2003)("[P]ace boners' and pace trimmers' donning and doffing of sanitary and safety equipment," including a helmet, a frock (white smock), a plastic apron, an arm guard, a belly guard, a plastic arm sleeve, a variety of gloves, a hook, a knife holder, and a chida, "does not constitute 'changing clothes' under Section 203(o)."); Fox, 2001 U.S. Dist. LEXIS 26050[5](The donning and doffing of cotton smocks, hair nets, beard nets, ear plugs, safety glasses, plastic aprons, thin knit gloves, plastic sleeve guards, and safety shoes or boots is not "changing clothes" under § 203). In Chavez v. IBP, Inc., 2005 U.S. Dist. LEXIS 29714 (E.D. Wash. May 16, 2005), the Eastern District Court of Washington concluded that donning and doffing of personal protective equipment in a unionized beef processing plant was compensable and not excluded by § 203(o). Chavez, 2005 U.S. Dist. LEXIS 29714. In Chavez, the hides processing employees wore a second set of "street clothes" under their other

---

[5]As previously discussed, this decision was reversed based on new precedent. See page 23, ft. 4, above.

protective clothing or equipment because the smells in the plant were too strong to wear the same set of clothes home. Id. at *88. The District Court determined that "because the hides employees' non-specialized second set of street clothing is not required by Tyson and is not protective equipment, changing time for that clothing may be excluded under § 203(o)." Id. However, the Court found the donning and doffing by the meat processing and slaughter employees of their protective equipment was compensable. Id. In Sproele v. Kraft Foods Global, Inc., 2007 U.S. Dist. LEXIS 95037 (W.D.Wis. 2007), the District Court for the Western District of Wisconsin held that donning and doffing protective equipment worn at a meat processing plant constituted "principal activities" and did not constitute noncompensable preliminary and postliminary activities under 29 U.S.C. § 254(a) of the Portal-to-Portal Act. Id. The Court also found that the employer failed to show that the equipment constituted "clothes" under § 203(o) for time spent "changing clothes," and that the amount of time spent donning and doffing equipment was not shown to have been *de minimis*. Id.

The Plaintiffs maintain that Cargill cannot establish that all of the items worn by Plaintiffs constitute "clothing." (Doc. 274, p. 14). Viewing the evidence

32

presently of record[6] in the light most favorable to the Plaintiffs, the non-mesh-wearing employees don the following: smock, hard hat, hair net, ear plugs, steel-toed boots, safety glasses, plastic gloves (for seven separate job classifications), rubber gloves (for seventeen separate job classifications), plastic sleeves (for eight separate job classifications), and cut resistant gloves (for thirty-seven of the plant's ninety-one job classifications).  See (Doc. 275-8, Ex. 7, pp. 2-3, ¶ 8); (Doc. 273, p. 7-9); (Doc. 275-10); (Doc. 275-11); (Doc. 275-12).

The language of § 203(o) demonstrates that it is an exclusionary clause of the FLSA.  29 U.S.C. § 203(o)("there shall be excluded any time spent in changing clothes").  The Third Circuit Court of Appeals has interpreted portions of § 203 as exceptions.  Marshal v. Brunner, 668 F.2d 748, 751 (3d Cir. 1982)(The "ultimate consumer" exception is found in § 203(i)); see also Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 732, 735, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981)(referring to § 203(o) as an "exception" to the FLSA).  The Supreme Court has held that FLSA exemptions "are to be narrowly construed against the employers seeking to assert them." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S. Ct. 453,  4 L. Ed. 2d 393 (1960)(citing

---

[6]There is nothing before the Court at this time which identifies with sufficient particularity the protective equipment worn by identified employees in each department in each job title.

Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295, 79 S. Ct. 756, 3 L. Ed. 2d 815
(1959)); see also Auer v. Robbins, 519 U.S. 452, 462, 117 S. Ct. 905, 137 L.Ed.
2d 79 (1997); Reich v. Gateway Express, Inc., 13 F.3d 685, 694 (3d Cir. 1994).
The burden of proof is on the employer to establish an exemption. N.J.
Policemen's Benevolent Assoc. v. New Jersey Transit Corp., 806 F. 2d 451, 458
(3d Cir. 1986). Exemptions are limited to those plainly and unmistakably within
their terms and spirit. Arnold, 361 U.S. at 392, citing Mitchell, 359 U.S. at 295
(determining that House and Senate Conferees used the term "credit companies"
to mean nothing more nor less than companies that deal in credit); see also
Alvarez, 339 F.3d at 905 (Protective gear did not "clearly and unmistakably" fit
within § 203(o)'s "clothing" term.) Further, for purposes of statutory
interpretation, an exception contained in § 203 should not be treated differently
from an exemption contained in § 213.[7] See Holly Farms Corp v. NLRB, 517
U.S. 592, 602, 116 S. Ct. 1396, 1402 (1996)(In interpreting 29 U.S.C. § 203(f),
the Supreme Court noted that "[i]t is well settled that exemptions from the Fair
Labor Standards Act are to be narrowly construed.") Here, material facts must be
viewed not only in the light most favorable to the Plaintiffs, but § 203(o) must

---

[7]Cargill argues that § 203(o) is not an exemption but a definition and therefore should not
be narrowly construed against the employer as noted in Anderson v. Cagle's, Inc., 488 F.3d 945
(11th Cir. 2007). (Doc. 284, pp. 9-10).

also be narrowly interpreted against Cargill and Cargill is required to satisfy the

burden of proof in establishing a § 203(o) exception.

The Third Circuit Court of Appeals has not interpreted "clothes" in §

203(o). In Turner v. City of Philadelphia, the Court analyzed what constituted a

"custom or practice" under a CBA. Turner, 262 F.3d at 225. However, there was

no dispute that the corrections officers' uniforms were "clothes." Id. In De

Asencio, the employees at a chicken processing plant brought claims for payment

for time spent donning and doffing, as well as washing, their work gear as

required by the FLSA. De Asencio v. Tyson Foods, Inc., 500 F.3d 361 (3d Cir.

2007). The trial court gave a jury instruction regarding "work" under the FLSA

stating that the jury must consider whether the donning and doffing activities

involved physical or mental exertion. Id. at 363. On appeal, the Third Circuit

concluded that the jury charge was an error of law because it "impermissibly

directed the jury to consider whether the poultry workers had demonstrated some

sufficiently laborious *degree* of exertion, rather than some form of activity

controlled or required by the employer and pursued for the benefits of the

employer." Id. at 373 (emphasis in original). The Third Circuit recognized that §

203(o) was not applicable because there was no CBA; however, the Court stated:

the very existence of this carve-out for changing time under the

heading "Hours Worked" in the statute provides at least some
indication that such activity is itself properly considered "work"
under the FLSA. See Turner v. City of Philadelphia, 262 F. 3d 222,
224 and 225 n.1 (3d Cir. 2001) (examining § 203(o) and noting that
"[w]e assume *arguendo*, as plaintiffs would have us do, that *clothes
and uniform change time would ordinarily be included within hours
worked. . .* Defendants do not dispute this point."). No mention of the
"cumbersome" or "heavy" nature of the changing or washing may be
found in the statute. See Steiner, 350 U.S. at 255 (observing that the
"clear implications" of the statute is that changing and washing *is* a
principal activity unless otherwise excluded from coverage by
statute).

Id. at 373, n.11 (emphasis in original).

After reviewing the facts in the light most favorable to the Plaintiffs, it is

concluded that Cargill has not established that the above listed protective

equipment fits within the term "clothes" in § 203(o).  The heretofore cited Third

Circuit Court of Appeals opinions require the terms of § 203(o) to be construed

against the employer trying to assert them.  At this stage of the proceedings, it

cannot be concluded, as a matter of law, that a smock, hard hat, hair net, ear plugs,

steel-toed boots, safety glasses, plastic gloves, rubber gloves, plastic sleeves, and

cut resistant gloves are clearly and unmistakably recognized as clothing.  Such

items may be more appropriately defined as safety equipment or gear worn by an

employee for protection.  This protective gear is obviously different from typical

work-related clothing.  It has, as a basis, functional aspects such as safety as

opposed to such apparel as the corrections officers' uniforms discussed in Turner v. City of Philadelphia, 262 F.3d 222 (3d Cir. 2001). Further, most of the equipment *sub judice* could not be categorized merely as "outer garments" or "covering for the body or garments in general." See Bejil, 269 F.3d at 594, n.3. Cargill, in its own Safety Rules and Safety Code Book, refers to the gear as "personal protective equipment" while describing "shirts with short or long sleeves, and pants" as "Clothing." (Doc. 275-2, pp. 12-13) and (Doc. 275-3, p. 6, Ex. p. 5). Consequently, as previously stated, Cargill has not satisfied its burden to prove, as a matter of law, that the described equipment is "clothing" under § 203(o).

ii. Custom or Practice

As noted above, to succeed on its § 203(o) defense Cargill must establish: (1) the protective equipment worn by the Plaintiffs is "clothing" under § 203(o), and (2) the payment/non-payment of the Hazleton Plaintiffs for donning and doffing the protective equipment qualifies as a custom or practice under the 2002 CBA and the 2007 CBA. See Turner v. City of Philadelphia, 262 F.3d 222, 225 (3d Cir. 2001). It has been determined that the evidence does not support a conclusion that the equipment at issue is "clothes" and, therefore, Cargill has not met the first prong of the § 203(o) defense. However, for the following reasons, it is concluded that the payment/nonpayment for donning and doffing of protective

equipment qualifies as "custom or practice" under the 2007 CBA but was not a "custom or practice" under the 2002 CBA.

The Third Circuit Court of Appeals' determination of what is a "custom or practice under a bona fide collective-bargaining agreement" is controlling on this Court. See Turner, 262 F.3d 222. In Turner, corrections officers in a class action suit sought overtime compensation under the FLSA for time spent changing into and out of their uniforms. Id. at 224. The District Court for the Eastern District of Pennsylvania granted the defendant's motion for summary judgment holding that there was no genuine issue of material fact as to the existence of a "custom or practice under a bona fide collective bargaining agreement" based on the following uncontroverted facts:

> (1)The City of Philadelphia has not compensated corrections officers for change time for over 30 years.
>
> (2) Every collective bargaining agreement between the City of Philadelphia and the corrections officers' union--the American Federation of State, County and Municipal Employees District Council 33, Local 159B--has been silent as to compensation for uniform change time.
>
> (3) William Turner, one of the lead plaintiffs, served for some time as the union's president. During his tenure (between June 1994 and June 1997), he proposed at several labor management meetings with the Commissioner and Deputy Commissioner of Prisons, and with Philadelphia's Labor Relations Administrator, that change time be made compensable. However, the union did not make this request in

38

> formal collective bargaining negotiations. At the same time, the union
> did ask for and receive a uniform maintenance allowance and
> overtime compensation for the one hour per week that corrections
> officers spent at mandatory pre-shift roll calls.
>
> (4) The union never filed a grievance or demanded arbitration based
> on the non-compensability of change time.

Id. at 225.[8]  The Court of Appeals affirmed and held that the existence of formal

negotiations regarding time spent changing is not necessary to establish a "custom

or practice" and that under the well established principle of labor law a "custom or

practice" can become an implied term of a labor agreement through a prolonged

period of acquiescence. Id. at 226.

Since the Hazleton Plant opened in January 2002, Cargill has paid "mesh-

wearing" employees five minutes per day to don and doff their personal protective

equipment. (Doc. 267, p. 5, ¶¶ 16-17); (Doc. 273, pp. 12-13, ¶¶ 16-17).  This

payment has not changed since the first day of operation at the Hazleton Plant.

(Doc. 267, p. 5, ¶ 18); (Doc. 273, p. 13, ¶ 18).  Contrariwise, since the Hazleton

Plant began operation, "non-mesh-wearing" employees did not receive extra pay

for time spent donning and doffing their equipment.   (Doc. 267, p. 6, ¶ 20); (Doc.

273, p. 13, ¶ 20).

---

[8]There was no dispute over whether the corrections officers' uniforms were "clothes" under § 203(o). Id. at 224-25.

The first CBA between the parties covered the work period from May 10, 2002 through February 25, 2007. During the spring of 2002 negotiations leading up to the 2002 CBA, neither the Union nor Cargill raised the issue of donning and doffing pay and the 2002 CBA was silent on the issue of compensation for time spent donning and doffing personal protective equipment. (Doc. 267, p. 9, ¶¶ 36, 39); (Doc. 273, pp. 17-18, ¶¶ 36, 39). Through February 25, 2007, no grievances were filed by the Union or any employees concerning payment for time spent donning and doffing equipment. (Doc. 267, p. 10, ¶¶ 40, 41) and (Doc. 273, p. 18, ¶¶ 40, 41).

As noted above, a custom or practice can become an implied term of a labor agreement through a prolonged period of acquiescence. Turner, 262 F.3d at 226. However, here, the payment of an extra five minutes for "mesh-wearing" employees and the lack of payment for "non-mesh-wearing" employees, was in effect at the Hazleton plant for only approximately four months (January to May 2002) before the 2002 CBA was finalized. Four months is not a prolonged period of acquiescence. See Turner, 262 F.3d at 226 (Thirty years of practice rises to the level of "custom or practice" under § 203(o)). In addition, prior to the 2002 CBA, according to Chad Young, the Chief Spokesperson for the Union, who attended all the 2002 negotiation meetings, there were no discussions or negotiations regarding

donning and doffing.  (Doc. 265-12, Ex. K, ¶¶ 2-5); <u>see also</u> (Doc. 265-9, Ex. G, p.

53, l. 22)(Wendall W. Young, IV, Union Vice-President does not recall donning

and doffing being discussed during the 2002 negotiations).  Therefore, the

payment of "mesh-wearing" employees and the lack of payment of "non-mesh-

wearing" employees was not a "custom or practice" when the 2002 CBA was

adopted.

In 2006, the Union and Cargill began negotiating what would become the

2007 CBA which would cover the period from February 25, 2007 to the present.

(Doc. 267, pp. 7, 11, ¶¶ 25, 43); (Doc. 273, p. 18, ¶ 43).  As previously stated

herein, when the negotiations began, Cargill had been paying "mesh-wearing"

employees for an extra five minutes and not paying "non-mesh-wearing"

employees for donning and doffing for over five years (January 2002 to February

2007).  During negotiations, on September 21, 2006, the Union made a written

proposal to Cargill regarding pay for donning and doffing time for all hourly

employees.  The proposal, identified as "U-26" in the Union's list of proposals,

stated:

> U-26 New Section 1 - The Company will compensate employees for
> any donning, doffing, walking, waiting or washing time in accordance
> with federal and state laws.

(Doc. 267, p. 11, ¶ 46); (Doc. 273, p. 19, ¶ 46). Proposal "U-26" was not accepted by Cargill and the Union ultimately decided not to pursue it. (Doc. 267, p. 13, ¶ 53); (Doc. 273, p. 20, ¶ 53). A day after the written proposal, on September 22, 2006, in a lunch meeting attended by Cargill representative, Gary Bright, Union Vice-president, Wendall Young, and Union Secretary-Treasurer Michele Kessler, Wendall Young informed Gary Bright that the Union "understood what the practice was, and we were not proposing a change in the practice." (Doc. 265-9, Ex. G, p. 66); (Doc. 265-12, Ex. J, ¶¶ 7-9). Wendall Young's understanding following the lunch meeting was that "they had no intention of changing it. And based on that, I had no problem withdrawing the language." (Doc. 265-9, Ex. G, p. 67, ll. 19-22). Wendall Young explained that "U-26" was proposed "because the International was looking for some kind of uniform language" and the Union did not pursue it because "we have bigger issues here. Healthcare and – we didn't have a donning and doffing problem at this plant." (Doc. 265-9, Ex. G, pp. 63-64). The language in "U-26" was not added to the 2007 CBA and it is silent on the issue of donning and doffing compensation. No grievances have been filed by the Union or an employee under the 2007 CBA regarding the issue, and Cargill has continued to pay "mesh-wearing" employees five extra minutes and not to pay "non-mesh-wearing" employees for donning and doffing. (Doc.267, p. 13, ¶¶ 54

and 55) and (Doc. 273, p. 20, ¶¶ 54 and 55).

Because of the Union's proposal during negotiations and the rejection of the proposal, the payment to "mesh-wearing" employees and the non-payment to "non-mesh-wearing" employees became a "custom or practice" under the 2007 CBA.  The non-compensation of time spent donning and doffing clothing prior to a shift became a 'practice' under § 203(o) when the union raised the issue of compensation during negotiations, then withdrew it, and the CBA was silent on the issue.  Hoover v. Wyandotte Chem. Corp., 455 F.2d 387, 389 (5th Cir. 1972), cert. denied 409 U.S. 847, 93 S. Ct. 52 (1972); see also Bejil v. Ethicon, Inc., 269 F.3d 477, 480 (5th Cir. 2001); Arcadi v. Nestle Food Corp., 38 F.3d 672, 675 (2d Cir. 1994); Davis v. Charoen Pokphand (USA), Inc., 302 F. Supp. 2d 1314 (M.D. Ala. 2004).  Whether the five years of acquiescence alone would amount to a "custom or practice" need not be decided inasmuch as the five years of acquiescence, in addition to the negotiations concerning payment for donning and doffing, establishes that Cargill's payment methods for donning and doffing amounted to a "custom or practice" under the 2007 CBA.  This determination is added to demonstrate that if Cargill establishes that the gear at issue is clothing under the first prong, the Plaintiffs will still have a claim for lost wages under the 2002 CBA for up to and including February 25, 2007.  Nevertheless, this

determination does not affect the prior holding that the record does not

demonstrate that the personal protective equipment identified herein constitutes

"clothes" under § 203(o).

(iii)    Travel Time and Lunch Period Donning and Doffing

Cargill also contends that the Plaintiffs' claims for time spent walking to

and from their work stations at the beginning and end of the workday, time spent

donning and doffing their personal protective equipment at the beginning and end

of the lunch period, time spent walking to and from the lunch room, time spent

waiting to pick up items of equipment at the beginning of the work day, and

equipment cleaning time at the end of the work day should be denied if Cargill's §

203(o) argument prevails. Because Cargill's § 203(o) defense was rejected, this

argument need not be addressed. Further, "[d]uring a continuous workday, any

walking time that occurs after the beginning of the employee's first principal

activity and before the end of the employee's last principal activity is excluded

from the scope of that provision, and as a result is covered by the FLSA."

Alvarez, 546 U.S. at 520-521. Assuming § 203(o) does not apply, the donning

and doffing of protective gear at the beginning and end of the day would qualify as

"principal activities" and under the "continuous workday" rule any activity

between the commencement and completion of the donning and doffing would be

44

compensable. Id.

As noted herein in footnote 7, in Section IV, there is nothing in the record, indicating, as to each department and job title at the Cargill Hazleton plant, the protective gear that is worn and the time it takes to don and doff the specific protective gear. The record indicates that non-mesh-wearing employees don and doff specialized equipment in addition to the following required equipment: smock, hard hat, hair net, ear plugs, steel-toed boots, and safety glasses. See (Doc. 275-8, Ex. 7, pp. 2-3, ¶ 8). Consequently, Plaintiffs' statement of material fact, that many non-mesh-wearing employees wear specialized PPE must, and will be, accepted. (Doc. 273, p. 9, ¶ 6).

The record does not indicate the amount of time required to don and doff PPE, so as a result, at this time it is difficult to make a determination as to whether the donning and doffing of PPE is *de minimis*. Additionally, there is nothing of record describing the shape or structure of the protective equipment in question. Of course, the physical and mental exertion of the changing activities is not germane to the issue of whether those activities are "work" under the FLSA. De Asencio, 500 F.3d at 347. However, a determination of the shape and structure is relevant to the amount of time required to don and doff the particular PPE which is essential to a *de minimis* ruling.

45

Nevertheless, any other pre-donning and post-doffing waiting time, which is not time spent washing equipment, is excluded from compensation because it is a "preliminary" activity and not a "principal" activity or "integral and indispensable" to a "principal activity." Alvarez, 546 U.S. at 528.

Additionally, § 203(o) does not relate to donning, doffing and travel time during lunch breaks because such activities do not arise "at the beginning or end of each workday." 29 U.S.C. § 203(o). However, Cargill maintains that Plaintiffs' claims for compensation for time spent donning and doffing equipment prior to and following the lunch period are not viable. Specifically, Cargill argues that the lunch period has been extended an additional two to three minutes each day to compensate for said doffing and donning and also maintains that this donning and doffing is negligible. (Doc. 284, pp. 24-25). Cargill agreed to the extra lunch period time at the request of the Union shortly after adoption of the 2002 CBA. Id. As stated above, there is insufficient evidence of record as to the shape or structure of the PPE or to the time it takes to don and doff the PPE. Therefore, at this time, a reliable determination cannot be made as to whether the donning and doffing of the PPE, either at the beginning or end of the workday, or before and following lunch, is *de minimis* or negligible.

46

## B. FLSA Section 259 Defense

Cargill contends that its reliance on the June 6, 2002 and May 14, 2007 opinion letters of the DOL was in "good faith" and that § 259 of the FLSA affords Cargill a complete defense to Plaintiffs' donning, doffing, and related claims. Section 259 provides:

> (a) In any action or proceeding based on any act or omission on or after the date of the enactment of this Act [enacted May 14, 1947], no employer shall be subject to any liability or punishment for on or account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

> (b) The agency referred to in subsection (a) shall be--
> (1) in the case of the Fair Labor Standards Act of 1938, as amended--
> the Administrator of the Wage and Hour Division of the Department of Labor [Secretary of Labor].

29 U.S.C. § 259. The June 6, 2002 and May 14, 2007 opinion letters were issued by the Administrator of the Wage and Hour Division of the DOL and are exactly

the type of written administrative rulings § 259 references.

The employer bears the burden of proof to establish a § 259 exception. Alvarez, 339 F.3d at 907. In accordance with the plain language of the statute and the implementing regulations, courts have found that an employer seeking to invoke the § 259 good faith defense must show that it acted: (1) in good faith, (2) in conformity with, and (3) in reliance on the specified agency's writing, practice, or policy. See Alvarez, 339 F.3d at 907; Frank v. McQuigg, 950 F.2d 590, 598 (9th Cir. 1991); Hultgren v. County of Lancaster, Nebraska, 913 F.2d 498, 507 (8th Cir. 1990); Equal Employment Opportunity Comm'n v. Home Insurance Co., 672 F.2d 252, 263 (2d Cir. 1982); 29 C.F.R. § 790.13(a)("the act or omission complained of must be both 'in conformity with' and 'in reliance on' the administrative regulation . . . and such conformance and reliance and such act or omission must be 'in good faith'").

Cargill's own statement of facts demonstrates that at this stage of the proceedings it has failed to establish the third prong. An employer must prove that he actually relied upon the administrative ruling. 29 C.F.R. 790.16(a). Cargill's "practice (paying "mesh-wearing" employees five minutes pay for donning and doffing and not paying "non-mesh-wearing" employees for donning and doffing) has not changed since the Hazleton Plant's first day of operations" in January

48

2002. (Doc. 267, p. 5, ¶ 18). It is unchallenged that this practice was

implemented by Sean Mott, the Hazleton Plant's first Human Resources Director,

who determined that five minutes per day was the appropriate amount of pay

based on his prior work experience at Cargill's Newnan, Georgia plant. (Doc.

267, p. 6, ¶ 19). Cargill concedes that this payment and non-payment for donning

and doffing began at the opening of the plant in January of 2002. Therefore,

according to Cargill, this policy decision regarding payment/non-payment for

donning and doffing was made approximately four months prior to the issuance of

the June 6, 2002 opinion letter upon which Cargill alleges it relied in making the

policy decision. The Code of Federal Regulations in interpreting the § 259

defense notes:

> Assume, for example, that an employer failed to pay his employees in
> accordance with the overtime provisions of the Fair Labor Standards
> Act. After an employee suit has been brought against him, another
> employer calls his attention to a letter that had been written by the
> Administrator of the Wage and Hour Division, in which the opinion
> was expressed that employees of the type employed by the defendant
> were exempt from the overtime provisions of the Fair Labor
> Standards Act. The defendant had no previous knowledge of this
> letter. In the pending employee suit, the court may decide that the
> opinion of the Administrator was erroneous and that the plaintiffs
> should have been paid in accordance with the overtime provisions of
> the Fair Labor Standards Act. Since the employer had no knowledge
> of the administrator's interpretation at the time of his violations, his
> failure to comply with the overtime provisions could not have been
> "in reliance on" that interpretation; consequently, he has no defense

under section 9 or section 10 of the Portal Act.

29 C.R.F. § 790.16(b). Similarly here, because Cargill obviously had no

knowledge in January, 2002, at the time of its decision not to pay for donning and

doffing of standard protective equipment, of the June 6, 2002 opinion letter, its

failure to comply with the FLSA could not have been "in reliance on" that opinion

letter.

In <u>Chavez v. IBP, Inc.</u>, 2005 U.S. Dist. LEXIS 29714 (E.D. Wash. 2005),

the District Court for the Eastern District of Washington was presented with an

identical § 259 defense. Tyson Food argued that it relied in good faith on the

same June 6, 2002 opinion letter because it had a collective bargaining agreement

under which payment for donning and doffing had been negotiated and omitted.

<u>Chavez</u>, 2005 U.S. Dist. LEXIS 29714 at * 109. The <u>Chavez</u> Court noted that

Tyson, prior to June 6, 2002, was paying only four minutes for donning and

doffing and that following the opinion letter Tyson did not change any of its

policies or positions in reliance on the letter. <u>Id</u>. The Court further noted:

> Tyson did not exercise subjective good faith, because it attempted to
> comply only with DOL opinion letters and legal rulings that reduced
> its responsibility to pay employees for compensable work. This
> opportunistic approach does not amount to an honest intention to
> comply with the FLSA. Tyson did not exercise objective good faith
> because a reasonably prudent person would have examined the

50

> conflicting § 3(o) interpretations in place in June 2002, and taken the more conservative path. As the Tenth Circuit opined, "Congress has put the risk of a close case on the employer." <u>Reich v. IBP, Inc.</u>, 38 F.3d at 1127. Tyson has chosen to bear that risk here, and a good faith defense is not available.

<u>Id</u>. at *110.

Cargill may argue that its continued payment/non-payment for donning and doffing after the June 6, 2002 opinion letter was in reliance on said letter. However, it could be concluded, based on the initiation of the payment/nonpayment practice after the prior DOL opinion letters and before the 2002 opinion letter was issued, that the motivation of Cargill management in maintaining its payment policy was for some reason other than reliance on the opinion letter. At the very least, there is a genuine issue of material fact regarding Cargill's reliance on the June 6, 2002 opinion letter.

In addition, there are other questions of material fact as to whether Cargill's alleged reliance on said opinion letters was in "good faith." An employer's "good faith" is not to be determined merely from the actual state of his mind but also depends upon an objective test--whether the employer, in acting or omitting to act as he did, and in relying upon the ruling, acted as a reasonably prudent person would have acted under the same or similar circumstances. 29 C.F.R. 790.15(a).

"Good faith" requires that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry. Id.

When Cargill opened its Hazleton Plant and instituted its donning and doffing payment/non-payment policy, three opinion letters had been previously issued by the DOL advising on the topic at issue. As noted in Section III, herein, these opinion letters determined that putting on, taking off, and cleaning of the protective equipment and gear utilized in the meat packing industry is compensable and such items are not "clothes" under § 203(o). (Doc. 276, pp. 1-7). When Cargill's management initiated its donning and doffing policy at the Hazleton plant, it was aware of these prior opinion letters and their holdings. (Doc. 275-7, Ex. 5, p. 47, ll. 2-20) (Gary Bright, current Vice-President of Labor Relations and former President of Human Resources, testified he was aware of a letter prior to the June 2002 letter which had the opposite holding of the June 2002 letter.)

There is an issue as to whether the conflicting nature of the prior opinion letters and the subsequent opinion letters should have given Cargill caution. The Supreme Court has advised that "an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." INS v. Cardoza-Fonseca,

480 U.S. 421, 466 n.30, 107 S. Ct. 1207, 94 L. Ed. 2d 434 (1987); <u>Alvarez</u>, 339

F.3d at 905, n.9. Further, a decision from a United States Court of Appeals in

2003 rejected the June 6, 2002 opinion letter. <u>See</u> <u>Alvarez</u>, 339 F.3d 894

(Rejecting the Secretary's interpretation in the June 6, 2002 opinion letter based

on the inconsistent, prior interpretations contained in the 1997 opinion letter,

which was reaffirmed by a 2001 opinion letter). Facing the conflicting opinion

letters and the more pressing Court of Appeals decision, a reasonably prudent

employer would have acknowledged the conflicting rulings and, at least,

considered taking the more conservative path. <u>See</u> <u>Chavez</u>, 2005 U.S. Dist.

LEXIS 29714 at * 110; <u>see also</u> 29 C.F.R. 790.15(b) (Defense of Good Faith

Reliance on Administrative Regulations, etc.)("[I]f the employees later brought an

action against the employer, the court might determine that they were entitled to

the benefits of the Act and might decide that the employer, after learning of the

decision of the higher court, knew facts which would put a reasonably prudent

man upon inquiry and therefore had not provided his good faith in relying upon

the Administrator's ruling after receiving this advice."). "Congress has put the

risk of a close case on the employer." <u>Reich</u>, 38 F.3d at 1127. Like the employer

in <u>Chavez</u>, Cargill has chosen to bear the risk and, therefore, a good faith defense

is subject to challenge.

The May 14, 2007 opinion letter acknowledges the Ninth Circuit's decision in <u>Alvarez</u> but opined "that you may rely on the letter [June 6, 2002 opinion letter] for practices outside states within the jurisdiction of the Ninth Circuit." (Doc. 265-12, p. 14). As stated above, Cargill did not rely on the June 6, 2002 opinion letter when initiating its payment/non-payment policy at the Hazleton plant. However, Cargill argues that it relied on said letter following its publication. The <u>Alvarez</u> decision was filed on August 5, 2003. Cargill maintains that from 2003 until May 14, 2007, it relied in good faith on an administrative opinion letter over a decision of the Ninth Circuit Court of Appeals. Drawing all inferences in the favor of Plaintiffs, this argument is not dispositive and it is concluded that, based on the present record, Cargill has failed to satisfy its burden that a reasonably prudent employer would have relied on the June 6, 2002 opinion letter in light of the Ninth Circuit Court of Appeals decision and the prior opinion letters.

Cargill at no time changed its payment/non-payment policy at the Hazleton Plant since its inception in January of 2002. At the very least, there is a genuine question of material fact as to whether Cargill acted in good faith in relying on the June 6, 2002 opinion letter. A fact finder may conclude that a reasonably prudent person would have acted differently under these circumstances and, because of the objective nature of the defense, that Cargill may not have acted in good faith.

## C. Preemption

Cargill's preemption arguments are primarily premised on the determination that the Plaintiffs' FLSA claims are barred by § 203(o). However, as discussed in section III, herein, Cargill's § 203(o) defense has not been established; thus, this premise is not valid. Moreover, even if Cargill had established said defense, the Plaintiffs' state law claims would not be preempted by the FLSA but would be preempted by § 301 of the Labor Management Relations Act (hereinafter "LMRA").

### (i)   FLSA

Cargill argues that the FLSA preempts Plaintiffs' state law claims; specifically, that § 203(o) of the FLSA "conflicts"[9] with the PMWA and PWPCL and, therefore, the federal statute preempts the state statutes. Cargill insists that permitting Plaintiffs to proceed on their state claims, despite their FLSA claims being barred by § 203(o), would effectively circumvent and nullify the congressional goals and objectives embodied in § 203(o); namely, that parties to a collective bargaining agreement should be permitted to exclude clothes changing time from the realm of otherwise compensable activities. (Doc. 266, p. 42).

---

[9]The Third Circuit has recognized three forms of preemption: express, field and conflict. Fasano v. Federal Reserve Bank of New York, 457 F.3d 274, 280 (3d Cir. 2006). The only form raised by Cargill is preemption based on a conflict.

Cargill further contends that preemption applies because it would be "impossible for [Cargill] or other employers to comply with both federal and state law when they establish a custom or practice through collective bargaining of making otherwise compensable pre- and post-shift clothes changing activities non-compensable." (Doc. 284, p. 34).

"[W]hen the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered." Crosby v. National Foreign Trade Council, 530 U.S. 323, 373, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000). The FLSA was enacted in 1938 to correct existing "labor conditions detrimental to the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987). The FLSA provides that "[n]o provision of this Act [FLSA] or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this Act . . . or a maximum workweek lower than the maximum workweek established under this Act." 29 U.S.C. § 218(a). The intent of § 218(a) was to leave undisturbed "the

56

traditional exercise of the states' police powers with respect to wages and hours more generous than the federal standards." Lehman v. Legg Mason, 2007 U.S. Dist. LEXIS 69648, *11 (M.D. Pa. 2007)(Rambo, J.)(noting that courts holding that the FLSA impliedly preempts state wage and hour class actions are in the minority); citing Pac. Merch. Shipping Ass'n v. Aubry, 918 F.2d 1409, 1421 (9th Cir. 1990). "The purpose behind the FLSA is to establish a national *floor* under which wage protections cannot drop, not to establish absolute uniformity in minimum wage and overtime standards nationwide at levels established in the FLSA." Pac. Merch. Shipping Ass'n, 918 F.2d at 1425(emphasis in original).

The District Court for the Eastern District of Washington addressed this issue: whether § 203(o) conflicts with a state wage law that does not contain a similar exemption. Chavez, 2005 U.S. Dist. LEXIS 29714. The Chavez Court determined that § 203(o) does not conflict with Washington's wage act because "Washington's MWA does not frustrate a uniform federal scheme and does not frustrate the purpose of FLSA § 3(o) and the Portal Act § 4." Chavez, 2005 U.S. Dist. LEXIS 29714, at *118. The Court further held that § 203(o) "does not undermine, but instead, supplements the federal wage and hour 'floor' established in FLSA § 3(o)" and does not "supplant the traditional power of the state to more generously regulate wage and hours via their own state regulations." Id. at *119-

20.

"[O]rdinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." English v. General Electric Co., 496 U.S. 72, 89, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990); Williamson v. General Dynamics Corp., 208 F.3d 1144, 1153 (9th Cir. 2000); Takacs v. A.G. Edwards & Sons, Inc., 444 F. Supp. 2d 1100, 1117, n.12, (S.D. Cal. 2006). Further, there is nothing in § 203(o) or its legislative history to indicate that Congress sought to circumvent § 218(a) or interfere with a states' police powers with respect to wages and hours more generous than the federal standards. See Lehman v. Legg Mason, 2007 U.S. Dist. LEXIS 69648, *11 (M.D. Pa. 2007)(Rambo, J.) citing Pac. Merch. Shipping Ass'n v. Aubry, 918 F.2d 1409, 1421 (9th Cir. 1990). As Representative Herter stated on the House floor, the purpose of § 203(o) was "avoiding another series of incidents which led to the portal-to-portal legislation." 95 Cong. Rec. 11,210 (Aug. 10, 1949). The series of incidents which led to the Portal-to-Portal Act was litigation under the FLSA not state law legislation. See De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 306 (3rd Cir. 2003), citing 93 Cong. Rec. 2,082 (1947); see also 29 U.S.C. § 251.

Neither the PMWA nor the PWPCL contain a counterpart to § 203(o) or other similar provisions. (Doc. 266, p. 42); (Doc. 274, p. 41). A more beneficent

58

definition of hours worked embodied in the Pennsylvania statutes does not circumvent or nullify the purpose of § 203(o). <u>Chavez</u>, 2005 U.S. Dist. LEXIS 29714 at *120. The provisions of the Portal Act and §203(o) "indicate Congress's intent to better define the liability of employers under the FLSA. They do not, however, supplant the traditional power of the state to more generously regulate wage and hours via there [sic] own state regulations." <u>Id</u>.

Pennsylvania has not adopted a similar exception to § 203, and, as a result Pennsylvania law protects employees by not permitting unions and employers to negotiate away payment for donning and doffing of clothes as Congress has under the FLSA. As noted above, Cargill argues that it cannot comply with both the FLSA and Pennsylvania law regarding this matter. However, Cargill, in Pennsylvania, could comply with both laws by following the Pennsylvania law, which is more protective of individual employee rights, by paying its employees for donning and doffing of gear. Based on the entire scheme of the FLSA to protect workers and create minimum standards over which a state may more generously regulate, a successful § 203(o) defense would not preempt Plaintiffs' PMWA and PWPCL claims.

(ii) LMRA

In the alternative, Cargill argues that Plaintiffs' state law claims are

preempted by § 301 of the LMRA. This contention is also premised on a

determination that the Plaintiffs' federal claims are precluded by Cargill's § 203(o)

defense.

As the Supreme Court observed in <u>Clayton v. UAW</u>, 451 U.S. 679, 681, 68

L. Ed. 2d 538, 101 S. Ct. 2088 (1981), it is well established that "[a]n employee

seeking a remedy for an alleged breach of the collective-bargaining agreement

between his union and employer must attempt to exhaust any exclusive grievance

and arbitration procedures established by that agreement before he may maintain a

suit against his union or employer under § 301(a) of the Labor Management

Relations Act." <u>See also</u> <u>Hines v. Anchor Motor Freight, Inc.</u>, 424 U.S. 554, 563,

47 L. Ed. 2d 231, 96 S. Ct. 1048 (1976); <u>Vaca v. Sipes</u>, 386 U.S. 171, 184, 17 L.

Ed. 2d 842, 87 S. Ct. 903 (1967);  <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650,

652-53, 13 L. Ed. 2d 580, 85 S. Ct. 614 (1965); <u>Wheeler v. Graco Trucking</u>, 985

F.2d 108, 112 (3d Cir. 1993).  The interpretation of a collective bargaining

agreement is governed by federal law.  <u>Textile Workers Union v. Lincoln Mills</u>,

353 U.S. 448, 456-57, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957).  Federal labor law

preempts state-law claims for breach of a collective bargaining agreement covered

by the LMRA.  <u>Local 174, Teamsters v. Lucas Flour Co.</u>, 369 U.S. 95, 102-06, 7

L. Ed. 2d 593, 82 S. Ct. 571 (1962)(Employer subject to the LMRA asserted a

state-law claim against a union for breach of a collective bargaining agreement
and the Supreme Court held that the state-law claim was preempted noting that "in
a case such as this, incompatible doctrines of local law must give way to principles
of federal labor law.").

Indeed, the Supreme Court has subsequently held that the preemptive reach
of § 301 of the LMRA encompasses not only state-law claims that are directly
based on a collective bargaining agreement but also all those that are
"substantially dependent upon analysis of the terms" of the agreement. Allis-
Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 85 L. Ed. 2d 206, 105 S. Ct. 1904
(1985); see also Wheeler, 985 F.2d 108.  In Lueck v. Aetna Life Ins., the
Wisconsin Supreme Court held that an employee could sue his employer in tort
under state law for the bad-faith handling of a claim that the employee had
submitted under a disability plan contained in the collective bargaining agreement
between the employer and the employee's union.   Lueck v. Aetna Life Ins., 342
N.W.2d 699 (Wis. 1984), overruled by Allis-Chalmers Corp., 471 U.S. at 220.
The Supreme Court reversed this ruling and held that the state-law tort claim was
preempted by § 301 of the LMRA. Allis-Chalmers Corp, 471 U.S. at 220.  The
Court stated that "perhaps the most harmful aspect of the Wisconsin decision" was
that it allowed what was essentially a claim for breach of the collective bargaining

agreement "to be brought directly in state court without first exhausting the

grievance procedures established in the bargaining agreement." Id. at 219. The

Court explained:

> A rule that permitted an individual to sidestep available grievance
> procedures would cause arbitration to lose most of its effectiveness . .
> ., as well as eviscerate a central tenet of federal labor-contract law
> under § 301 that it is the arbitrator, not the court, who has the
> responsibility to interpret the labor contract in the first instance.

Id. at 220.

Applying these Supreme Court decisions, the Seventh Circuit, in National

Metalcrafters, Div. of Keystone v. McNeil, 784 F.2d 817 (7th Cir. 1986), held that

federal labor law preempted an employee's claim under the Illinois Wage Payment

and Collection Act, Ill. Rev. Stat. ch. 48, PP 39m-1 et. seq. (1979), for vacation

benefits allegedly due under the terms of a collective bargaining agreement.

Similarly, in Nicholas v. St. Agnes Medical Ctr., 1987 U.S. Dist. LEXIS 55 (E.D.

Pa. 1987)(Ditter, J.), the United States District Court for the Eastern District of

Pennsylvania concluded that federal labor law preempted a claim under the

PWPCL for monies allegedly due under a collective bargaining agreement.

In reliance on these authorities, the Third Circuit in Wheeler v. Craco

Trucking, held that Wheeler's state-law claim for wages allegedly due under the

collective bargaining agreement was preempted. <u>Wheeler</u>, 985 F.2d at 113.

Wheeler's claim was based on the collective bargaining agreement and, as a result,

was governed exclusively by federal law. <u>Id</u>. Wheeler was entitled to assert his

claim under § 301(a) of the LMRA but, as previously noted, he was first required

to attempt to make use of the exclusive grievance and arbitration procedures

contained in the collective bargaining agreement. <u>Id</u>.

Here, if it is determined that Cargill has established a § 203(o) defense, it

will also be concluded that Plaintiffs' state law claims for the time period of

February 26, 2007 (inception of the 2007 CBA) to the present were preempted by

§ 301. Such claims would be subject to the collective bargaining agreement and

the proper channel would be a grievance filed in compliance with the 2007 CBA.[10]

A determination of the state law claims for this period would be "substantially

dependent upon an analysis of the terms," practices, and customs of the 2007 CBA

and would be preempted by federal law. <u>See</u> <u>Allis-Chalmers Corp.</u>, 471 U.S. at

220; <u>see also</u> <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 405-06, 108

---

[10]Article 18, Adjustment of Grievances, of the 2002 CBA and the 2007 CBA outlines the procedures that shall apply to all grievances "pertaining to matters involved in this Agreement or incident to the employment relationship."(Doc. 265, Ex. H, Ex. p. 11). First, aggrieved employee(s) shall notify the department supervisor within three days of knowledge of an incident to discuss and resolve the grievance. <u>Id</u>. If the grievance is not resolved, the matter eventually proceeds to a meeting between the local union representative and Cargill's general managers and, if still not settled, the grievance is to proceed to binding arbitration. <u>Id</u>.

S. Ct. 1877, 100 L. Ed. 2d 410 (1988)(§ 301 preemption appropriate only if

"resolution of a state-law claim depends upon the meaning of a collective-

bargaining agreement."); Kline v. Security Guards, Inc., 386 F.3d 246, 256 (3d

Cir. 2004)("dispositive question . . . is whether . . . state claims require an

*interpretation* of a provision of the CBA"); Penna Nurses Ass'n v. Penna State

Educ. Ass'n, 90 F.3d 797, 807 (3d Cir. 1996)("Only state-law rights and

obligations that depend upon an interpretation of the collective bargaining

agreement are preempted."); Wheeler, 985 F.2d 108.

  While not controlling, the decision in Townsend v. BC Natural Chicken

LLC by the United States District Court for the Eastern District of Pennsylvania is

persuasive. Townsend v. BC Natural Chicken LLC, 2007 U.S. Dist. LEXIS 8282

(E.D. Pa. 2007)(Baylson, J.). In Townsend, similar to the case *sub judice*,

plaintiffs brought PMWA, PWPCL, and FLSA claims for overtime pay for time

spent "donning" and "doffing" personal protective equipment. Id. Judge Baylson

granted the defendants' motion to dismiss finding the plaintiffs' PMWA and

PWPCL claims were preempted. Id. at *15-16. The Court noted that the parties'

arguments revolved around the interpretations of a specific section of the CBA

which provided "twelve (12) minutes pay per week to provide for wash up time."

Id. at *15. Judge Baylson concluded that whether time spent "donning and

doffing" represented hours worked is a matter of interpretation of the CBA

requiring preemption. Id. citing Vadino v. A. Valey Eng'rs., 903 F.2d 253 (3d Cir.

1990)(stating that "the FLSA contains no language suggesting that an action filed

thereunder would be an appropriate vehicle for the interpretation of a disputed

provision of the collective bargaining agreement" and that the courts should

resolve "the contract interpretation issue through the grievance procedure to

arbitration"); see also Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S.

732, 735, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981) (recognizing the tension that

arises between national labor policy that encourages negotiation of terms and

conditions of employment through the collective bargaining process when the

parties to a collective-bargaining agreement make an employee's entitlement to

substantive statutory rights subject to contractual dispute-resolution procedures

and holding that the courts should defer to an arbitral decision where the

employee's claim is based on rights arising out of the collective bargaining

agreement; but, where the asserted FLSA rights are independent of the collective

bargaining agreement then they are best protected in a judicial forum).

Here, while there is no specific section of the 2007 CBA which needs

interpreting, a determination of the Plaintiffs' state court claims would require

interpretation of implied terms of the CBA if Cargill had established a § 203(o)

exception. If Cargill establishes a § 203(o) defense, we will have determined that, in the 2007 CBA, there is an implied term as follows: "mesh-wearing employees are to be paid five minutes extra per day for time spent donning and doffing there PPE and washing time and non-mesh-wearing employees are not to be paid for time spent donning and doffing their PPE or washing time." If the § 203(o) defense is established, the threshold issue, turns on an interpretation of the CBA. However, as noted in Section III, herein, it has not been shown that the Plaintiffs' claim for changing protective equipment is covered by the exception of § 203(o). Since Cargill has not established an exclusion under § 203(o) as a matter of law, a determination of the claim for donning and doffing time is not dependent upon an interpretation of the CBA. Thus, at this stage of the proceedings, it cannot be concluded that § 301 of the LMRA preempts Plaintiffs' state-law claims.

### D. Merit of the State Law Claims

Cargill's final argument is that the Plaintiffs' state-law claims lack substantive merit. More specifically, Cargill argues that because the Plaintiffs have not identified a contractual provision, other than the CBA, upon which they base their state law claims, particularly the breach of contract and PWPCL claims, their state-law claims must fail. (Doc. 266, p. 46). De Asencio, 342 F.3d at 309-10; and Weldon, 896 F.2d at 801 hold that the PWPCL does not create a

66

substantive right to compensation but provides a statutory remedy when the employer breaches a contract obligation to pay earned wages. Here, the only contractual sources for Plaintiffs' compensation claims are the 2002 and 2007 CBAs. Cargill submits that there is no evidence that it has breached its obligation under said agreements and, therefore, the Plaintiffs' state-law claims are without merit. (Doc. 266, p 47).

"The Wage Payment and Collection Law provides employees a statutory remedy to recover wages and other benefits that are *contractually* due to them." Oberneder v. Link Computer Corp., 548 Pa. 201, 696 A.2d 148, 150 (Pa. 1997) (emphasis added); Thomas Jefferson Univ. v. Wapner, 2006 Pa .Super. 156, 903 A.2d 565, 574 (Pa. Super. 2006); Kafando v. Erie Ceramic Arts Co., 2000 Pa. Super. 377, 764 A.2d 59, 61 (Pa. Super. 2000); Hartman v. Baker, 2000 Pa. Super. 140, 766 A.2d 347, 352 (Pa. Super. 2000). Accordingly, a prerequisite for relief under the PWPCL is a contract between employee and employer that sets forth their agreement on wages to be paid. Mavrinac v. Emergency Med. Ass'n of Pittsburgh, 2005 U.S. Dist. LEXIS 45537, 2005 WL 2304995, at *8 (W.D. Pa. Sept. 21, 2005)(Hardiman, J.); Weldon v. Kraft Inc., 896 F.2d 793, 801 (3d Cir. 1990); Harding v. Duquesne Light Co, 882 F. Supp. 422, 427-28 (W.D. Pa. 1995). Relief under the PWPCL is implausible without existence of a contract.

Plaintiffs concede that their only viable state-law claim arises under the PMWA and that they do not have a claim for breach of contract or for a PWPCL violation. Therefore, the Motion for Summary Judgment as to Plaintiffs' Pennsylvania Wage Payment and Collection Law claim will be granted. Plaintiffs may proceed on their state-law claim under the PMWA.

## VII.  CONCLUSION

Cargill's Motion for Summary Judgment requests that Plaintiffs' claims be dismissed "in their entirety." (Doc. 265, p. 3). Based on the current record, it cannot be determined as a matter of law that the protective equipment worn by the Plaintiffs is "clothing" under 29 U.S.C. § 203(o) and, thus, Cargill's § 203(o) defense has not been established and the motion is denied regarding Plaintiffs' claims for time spent donning and doffing protective equipment. Also, because a § 203(o) defense has not been established, the donning and doffing of the protective equipment by the Plaintiffs is considered a principal activity and the time spent walking to the lines of production following the donning and prior to the doffing is compensable under the FLSA and the Portal to Portal Act. Therefore, the Defendant's Motion for Summary Judgment regarding the Plaintiffs' claim for time spent walking to the lines of production following

donning and walking from the lines of production prior to doffing will be denied.

Because the record is insufficient regarding the time it takes to don and doff the protective equipment and the size and shape of the protective equipment, a determination cannot be made as to whether the donning and doffing of the equipment is *de minimis* or negligible.  Therefore, the Defendants motion relating to Plaintiffs' claims for donning and doffing time, at the beginning and end of the workday, and at the beginning and end of lunch, based on the fact that such time is *de minimis*, will also be denied.

In as much as Cargill has not established a § 203(o) defense,  Plaintiffs' state law claims are not pre-empted and Cargills' Motion for Summary Judgment on the Plaintiffs' state law claims based on preemption will be denied.  However, since the Plaintiffs' have relinquished their claims for breach of contract and a violation of the PWPCL, the Defendant's Motion for Summary Judgment will be granted as to those claims.


DATE      April 10, 2008                     s/ William J. Nealon
                                             United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE CARGILL MEAT SOLUTIONS :
WAGE AND HOUR LITIGATION : No. 3:CV-06-513
 :
 : (JUDGE NEALON)
 :

## <u>ORDER</u>

**AND NOW**, this 10th day of April, 2008, in accordance with the accompanying

Memorandum of this date, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. 265) is DENIED in part and GRANTED in part;

2. The Defendants' Motion for Summary Judgment as to the Plaintiffs' claim under the Pennsylvania Wage Payment and Collection Law is granted.

3. The Defendants' remaining motions are denied.


s/ William J. Nealon
United States District Judge